IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 12, 2005

## STATE OF TENNESSEE v. SHIRLEY ANNETTE RUDD

**Appeal from the Circuit Court for Obion County**
**No. 3-397      William B. Acree, Judge**

---

**No. W2004-02065-CCA-R3-CD  - Filed September 12, 2005**

---

An Obion County jury found the defendant, Shirley Annette Rudd, guilty of facilitating the manufacture of methamphetamine, possession of methamphetamine with intent to sell or deliver, and conspiracy to manufacture methamphetamine. *See* Tenn. Code Ann. §§ 39-11-403, -12-103, -17-417 (2003). Pretrial, the defendant had moved to suppress methamphetamine seized from her person. The trial court conducted an evidentiary hearing and concluded that the evidence had been legally seized. The defendant challenges that ruling on appeal. After reviewing the record, applicable authorities, and the briefs of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court are Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Charles S. Kelly, Dyersburg, Tennessee (at trial); and Timothy Boxx, Dyersburg, Tennessee (on appeal), for the Appellant, Shirley Annette Rudd.

Paul G. Summers, Attorney General & Reporter; Mark A. Fulks, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and James Cannon, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

In this case, we are called upon to review the trial court's findings of fact and law in disposing of the defendant's motion to suppress.

On November 26, 2003, the trial court conducted a suppression motion hearing on claims raised by the defendant and by her co-defendant, Lisa Terry. The claims were not identical. The state presented testimony from three witness, and much of the testimony, which we shall not recount in detail herein, addressed the co-defendant's suppression issues.

One of the state's witnesses, Matt Woods, a deputy with the Obion County Sheriff's Department, acted as the affiant to obtain a search warrant for the residence belonging to co-defendant Terry. The residence was located approximately three miles outside the city limits of Hornbeak. As pertinent to the defendant in this case, Deputy Woods testified on cross-examination by defense counsel[1] that he first saw the defendant as he entered the co-defendant's driveway, intending to execute the search warrant. He related that the defendant "was standing at a side door located on the east side of the residence, knocking on the door." He assumed that the defendant had driven to the residence because a truck that the deputy knew to belong to the defendant was parked in the driveway.

Deputy Woods testified that as he walked toward the side door, the defendant stepped away from the door. He believed that the defendant asked, "What's going on?", and he responded that he had a search warrant for the house. Deputy Woods proceeded to the door and entered the residence. In the meantime, another officer at the scene, Officer John McMahan, detained the defendant. Deputy Woods described the detention in the following fashion:

> [The defendant] was detained due to – for officer safety purposes[.]
> When I got out of the vehicle, I advised [the defendant] what our –
> the reason for us being there was to serve a search warrant. Officer
> McMahan then detained [the defendant] for security purposes.

Deputy Woods was unable to elaborate what prompted the concern for officer security. He admitted, however, that the defendant posed no visible danger.

Obion County Sheriff Jerry Vastbinder testified briefly and identified photographs that he had taken of the co-defendant's residence and the surrounding area. He was not present during the execution of the search warrant, and his testimony did not address the defendant's suppression motion.

Deputy John McMahan was the state's last witness. He testified that as he approached the residence, the defendant was between the side door and her pickup truck. Deputy McMahan continued,

> [The defendant] came back toward the side of the truck, and it
> seemed to have flustered her that we were there. Anyway, she
> became very defensive about us being there and immediately stuck
> her hand – she stuck her hand in her pocket. And I'm not sure which
> hand. . . . She stuck one of her hands in her pocket of her jeans that
> she was wearing, and wouldn't remove it. She would not comply
> with any of our requests. We were trying to secure the scene. We

---

[1] The state elicited no direct-examination testimony from Deputy Woods relating to the defendant.

either wanted her to leave and get out of the way or to comply with what we were asking her.

Deputy McMahan estimated that he told the defendant to remove her hand three times. He said he used a "very commanding loud voice" and that he and the other officers "had our weapons drawn as we were trying to secure the scene."

Deputy McMahan testified that he had two concerns related to the defendant. He "figured" either the defendant was hiding something in her pocket or she had a weapon in her pocket, and because the defendant would not remove her hand, Deputy McMahan "forcibly took [the defendant] and leaned her against her truck and removed her hand from her pocket." At that point he saw a magnetic key holder, and he said that "it had several packets of a white powder substance in it." A subsequent search warrant for the defendant's pickup truck uncovered a plastic bag containing a white powder substance.

On cross-examination, Deputy McMahan testified that his assigned role in connection with the search warrant was "perimeter security." He elaborated that his task was "either to run anybody off that's on the outside, until we get the scene secured, or to take them into custody if they won't leave." He reiterated that he detained the defendant because she refused to remove her hand from her pocket, and he explained that the illegal drugs "c[a]me out of her pocket with her hand" and that there "was a little piece of aluminum foil that c[a]me out of there, too, that was burnt on it." According to the deputy, the burnt aluminum foil "was like what [they] find when they smoke meth."

From the testimony presented, the defendant argued that the officers lacked probable cause to arrest the defendant. The state claimed that Deputy McMahan acted appropriately in removing the defendant's hand from her pocket and that when the defendant came "out with her hand, the drugs f[e]ll out in plain view."

In denying the defendant's motion to suppress, the trial court ruled in pertinent part as follows:

> The Court finds that these facts existed at the time and, actually, they're undisputed. [The defendant] had the misfortune of being at [the co-defendant's] home during the time the search warrant was being executed. The evidence is that she was at the side door of [the] residence and was between the door and her vehicle, which was parked in the driveway. The officers came up, one officer told her to – Officer McMahan testified that she had two options, either to leave or be placed into custody – possibly be placed into custody. Officer McMahan testified that she put her hand in her pocket and was told about three times to remove her hand from her pocket, but she would not do so, at which point he forcibly took her hand from her pocket,

and as he did that, drugs fell out of her hand, and she was arrested because of those drugs.

. . . .

One of the things that's stated in [*State v.*] *Cothran*[, 115 S.W.3d 513 (Tenn. Crim. App. 2003)] as an inexplicable failure to remove a hand from a pocket is a basis for a *Terry* search. That's exactly the situation that was outlined by Officer McMahan. [The defendant] failed to remove her hand from her pocket after being told to do so on three occasions. The Court finds that the officer was justified in the *Terry* stop. The evidence that was discovered was discovered when the object fell out of her hand and was there for anyone to see. For those reasons, [the defendant's] motion is also denied.

Because testimony presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress, *see State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003); *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998), we turn next to the evidence presented at the defendant's trial.

As germane to the suppression issues raised by the defendant, Dana Rose, a forensic scientist with the Tennessee Bureau of Investigation, testified that she analyzed evidence seized in the case. A substance submitted in two separate bags tested positive for methamphetamine. Agent Rose explained that the larger bag contained 7.2 grams of methamphetamine and that the smaller bag contained 0.3 grams of the illegal substance.

Deputy Woods testified about his execution of the search warrant for the co-defendant's residence. His testimony regarding his contact and interaction with the defendant was consistent with his suppression hearing account of the events.

Deputy McMahan identified evidence that was seized at or near the residence, including the methamphetamine seized from the defendant, which was the 0.3 grams submitted to the TBI for analysis. He testified that when he first saw the defendant she had stepped away from the door of the house and "was closer to the truck." He related, as he had at the suppression hearing, how he commanded the defendant in a loud voice to remove her hand from her pocket, and he explained that the main concern was officer safety because the defendant may have had a weapon in her pocket. Regarding the discovery of the narcotics when he removed the defendant's hand from her pocket, Deputy McMahan told the jury that a magnetic key holder came out and that it contained methamphetamine. He said that he recognized the items once he examined them and that he "picked the items up and led [the defendant] back to [his] patrol vehicle and put her in there."

The defendant did not testify either at the suppression hearing or at trial.

As part of the defendant's motion for new trial, she claimed that the trial court erred in failing to suppress the search of her person after she was illegally arrested and detained by law enforcement while in the process of knocking on the door of the co-defendant's residence. We do not have before us a transcript of the hearing on the new trial motion, but an order appears in the record reciting that the motion was heard and denied on July 30, 2004. The record further reflects that the defendant filed her notice of appeal on August 27, 2004.

We begin our review by observing that "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). That is, a trial court necessarily indulges the presumption that a warrantless search or seizure is unreasonable and the burden is on the state to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure. *Id*.

Once the trial court has ruled on a suppression motion, our standard of appellate review requires acceptance of the trial court's findings regarding "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence," unless the evidence preponderates against the findings. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Cothran*, 115 S.W.3d 513, 519 (Tenn. Crim. App. 2003). The application of the law to the facts found by the trial court is, however, a question of law that is reviewed *de novo*. *Yeargan*, 958 S.W.2d at 629; *Odom*, 928 S.W.2d at 23.

On appeal, the defendant in this case acknowledges that well-settled law permits police officers to perform a protective frisk of a suspect when the officers have reasonable suspicion that the suspect may be armed. *See Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883 (1968); *State v. Bridges*, 963 S.W.2d 487, 492 (Tenn. 1997). The defendant also acknowledges that reasonable suspicion for a protective frisk may be based upon a suspect's "'otherwise inexplicable failure to remove a hand from a pocket.'" *Cothran*, 115 S.W.3d at 523 (quoting *State v. Winn*, 974 S.W.2d 700, 704 (Tenn. Crim. App. 1998)). Working from these principles, the defendant articulates the issue on appeal in the following fashion: "The [defendant] concedes Deputy McMahan had a valid basis for a *Terry* search. At issue is whether the magnetic key hold[er] that fell from the [defendant's] hand had an incriminating nature that was immediately apparent to the officer." The issue, thus framed, implicates the "plain view" exception to the warrant requirement of the Fourth Amendment and Article I, section 7 of the Tennessee Constitution.[2]

_____

[2] The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Fourth Amendment is applicable to the states through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691 (1961).

Article I, Section 7, of the Tennessee Constitution provides "[t]hat the people shall be secure in their persons,
(continued...)

In its most general terms, the plain view doctrine allows law enforcement officials to seize items in "plain view" while executing a search warrant naming other objects. *See Coolidge v. New Hampshire*, 403 U.S. 443, 91 S. Ct. 2022 (1971). In Tennessee, the plain view doctrine applies when (1) the objects seized were in plain view; (2) the viewer had a right to be in position for the view; (3) the discovery of the seized object was inadvertent, and (4) the incriminating nature of the object was immediately apparent. *State v. Hawkins*, 969 S.W.2d 936, 938 (Tenn. Crim. App. 1997); *State v. Horner*, 605 S.W.2d 835, 836 (Tenn. Crim. App. 1980). The United States Supreme Court dispensed with the inadvertent discovery requirement in *Horton v. California*, 496 U.S. 128, 110 S. Ct. 2301 (1990), and our courts have reached the same conclusion under the Tennessee Constitution. *See Cothran*, 115 S.W.3d at 525. *See generally State v. Coulter*, 67 S.W.3d 3, 43 (Tenn. Crim. App. 2001) (not mentioning inadvertent discovery as a requirement but not discussing the Tennessee Constitution).

The plain view requirement that the incriminating nature of the evidence be "immediately apparent" has been equated with "probable cause." As the Supreme Court wrote in *Minnesota v. Dickerson*, 508 U.S. 366, 113 S. Ct. 2130 (1993), "If . . . the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object–i.e., if 'its incriminating character [is not] "immediately apparent,"'–the plain-view doctrine cannot justify its seizure." *Id*. at 375, 113 S. Ct. at 2137 (citations omitted). Stated another way, the "'distinction between "looking" at a suspicious object in plain view and "moving" it even a few inches' is much more than trivial for purposes of the Fourth Amendment." *Arizona v. Hicks*, 480 U.S. 321, 325, 107 S. Ct. 1149, 1152 (1987).[3]

Interpreting Deputy McMahan's suppression hearing and trial testimony in this case, the defendant argues that the illegal narcotics were inside the magnetic key holder that came out of the defendant's pocket and fell to the ground. The defendant insists that the deputy did not say that the key holder was jarred open before or when it hit the ground, and she claims that there was nothing of an incriminating nature "immediately apparent" about the key holder. The defendant thus deduces that Deputy McMahan must have opened the key holder to identify the contraband, which constituted an independent "search" unsupported by probable cause.

---

[2](...continued)

houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted."

[3] We note, as did the Supreme Court in *Texas v. Brown*, 460 U.S. 730, 103 S. Ct. 1535 (1983), that "plain view" is perhaps better understood not as an independent "exception" to the warrant requirement, but rather an extension of whatever the prior justification for an officer's "access to an object" may be, which could be bottomed on an exception to the warrant requirement. *See* 460 U.S. at 739, 103 S. Ct. at 1541.

The state argues, as an initial matter, that the defendant waived the issue by failing to elicit any testimony during the suppression motion relating to "plain view." The state charges that the defendant is "attempting to take advantage of an alleged ambiguity [in Deputy McMahan's testimony] that exists because of her own failure to raise this issue under the plain view doctrine in the trial court." Likewise, the state asserts that the issue is waived because the defendant failed to mention "plain view" in connection with the suppression issue raised in her new trial motion.

We reject the state's waiver argument predicated on the defendant's failure to elicit testimony related to the plain view issue. In terms of what the testimony does or does not show, the burden of proof remained solidly on the state to demonstrate that one of the exceptions to the warrant requirement applied at the time the illegal narcotics were seized from the defendant.[4] That burden never shifted to the defendant. For that reason, the state's waiver argument is not well taken. The defendant was not required to prove that the plain view exception did not apply. Instead, the state was obliged to show that the warrantless seizure was not unreasonable because a recognized exception to the warrant requirement applied.

In addition, the trial court squarely relied upon the plain view exception in ruling that the narcotics would not be suppressed. "The evidence that was discovered," stated the trial court, " was discovered when the object fell out of her hand and was *there for anyone to see*." (Emphasis added). The defendant, in our opinion, is certainly entitled to raise the question of plain view inasmuch as the adverse ruling below was predicated on that very exception to the warrant requirement.

Last, we believe that the state unfairly parses the defendant's language in her new trial motion. To be sure, the defendant could have been more articulate, but the essence of her new trial claim was that the trial court erred in failing to suppress the narcotics seized from her person. *See State v. King*, 622 S.W.2d 77, 79 (Tenn. Crim. App. 1981) ("grounds relied upon must be specified with *reasonable certainty* in a motion for a new trial") (emphasis added).

In the alternative, the state emphasizes that because it prevailed on the suppression motion before the trial court, all reasonable inferences must be resolved in its favor. According to the state, the reasonable inferences derived from Deputy McMahan's testimony are that he discovered the key holder and the contraband simultaneously when they dropped to the ground from

---

[4] Although the officers were executing a search warrant for the premises of co-defendant, Lisa Terry, that warrant did not authorize the detention or search of the defendant, who occupied the position of a transient visitor. *See State v. Curtis*, 964 S.W.2d 604, 612 (Tenn. Crim. App. 1997) (discussing a split of authority on whether an officer executing a search warrant can detain and frisk a transient visitor to the premises being searched; stating "it is clear that an officer does not, as a general rule, have the right to search a transient visitor); *State v. Thomas*, 818 S.W.2d 350, 357-58 (Tenn. Crim. App. 1991) (discussing *Ybarra v. Illinois*, 444 U.S. 85, 100 S. Ct. 338 (1979), wherein Supreme Court concluded that a "warrant to search a place cannot normally be construed to authorize a search of each individual in that place"). Consequently, we apply and hold the state to the customary burden of demonstrating that the search or seizure was conducted pursuant to one of the exceptions to the warrant requirement.

the defendant's hand and that he immediately recognized the contraband from a lawful vantage point. We agree.

It is obvious from the trial court's ruling that it inferred from Deputy McMahan's testimony that the contraband, along with the key holder, fell from the defendant's hand: "Officer McMahan testified that she put her hand in her pocket and was told about three times to remove her hand from her pocket, but she would not do so, at which point he forcibly took her hand from her pocket, and as he did that, drugs fell out of her hand, and she was arrested because of those drugs." These findings are factual in nature, and we are obligated to accept them on appeal unless the evidence preponderates against the findings. *See Odom*, 928 S.W.2d at 23. The evidence, in our opinion, does not so preponderate. In particular, we note and find persuasive Deputy McMahan's suppression hearing explanation that the illegal drugs "c[a]me out of her pocket with her hand" and that there "was a little piece of aluminum foil that c[a]me out of there, too, that was burnt on it." According to the deputy, the burnt aluminum foil "was like what [they] find when they smoke meth."

In summary, we affirm the trial court's denial of the defendant's suppression motion; the methamphetamine was properly seized pursuant to the plain view exception to the warrant requirement.

_____
JAMES CURWOOD WITT, JR., JUDGE